UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BLAZEJ J. KOT,

                              Petitioner,

       v.
                                                    9:16-CV-00407
                                                    (GTS)
WILLIAM KEYSER, JR.,

                              Respondent.
_____

APPEARANCES:                        OF COUNSEL:

EASTON, THOMPSON LAW FIRM            BRIAN SHIFFRIN, Esq.
Attorney for Petitioner
16 W. Main Street, Suite 243
Rochester, New York 14614

HON. ERIC T. SCHNEIDERMAN           MICHELLE ELAINE MAEROV, AAG
Attorneys for Respondent
Office of the Attorney General
120 Broadway
New York, New York 10271


GLENN T. SUDDABY
Chief United States District Judge

## DECISION AND ORDER

## I.      INTRODUCTION

       Petitioner Blazej J. Kot, through counsel, filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet."); Dkt Nos. 3 through 5, State Court

Records filed by petitioner; Dkt. No. 7, Petitioner's Memorandum of Law ("Pet. Mem.").[1]

Petitioner challenges a 2010 judgment of conviction, following a jury trial in Tompkins County

_____

       [1]  The cited page numbers for the petition, petitioner's state court records, and petitioner's memorandum
of law refer to those generated by the court's electronic filing system ("ECF").

Court of Murder in the Second Degree, Arson in the Third Degree, and Tampering with Physical Evidence. Pet. at 2. Petitioner's conviction stems from his actions on the evening of June 2, 2009. That evening, while out jogging with his wife, petitioner struck her in the head with a pipe, slit her throat, and left her for dead. Petitioner then returned home and attempted to destroy evidence from the killing. As a result of his conviction, petitioner was sentenced to an aggregate term of twenty-five (25) years to life in prison with one year of post-release supervision. *Id.*

Petitioner argues in his habeas petition that his trial counsel was ineffective for various reasons. Pet. at 5-6; Pet. Mem. at 18-49. Respondent opposes the petition. Dkt. No. 14, Answer; Dkt. No. 14-1, Respondent's Memorandum of Law ("Resp. Mem."); Dkt. Nos. 15-1 through 15-6, State Court Records ("SR"); Dkt. Nos. 16-1 and 16-2, Transcripts ("T").[2] Petitioner filed a Reply Memorandum of Law. Dkt. No. 22, Reply Memorandum of Law ("Reply Mem.").

For the reasons that follow, the petition is denied and dismissed.

## II.     RELEVANT BACKGROUND

### A.     Factual Background and the Trial

In 2007, petitioner was a doctoral student at Cornell University in Information Science. After becoming disappointed in his Ph.D. program, petitioner dropped out and joined Predictive Systems, a technology start-up company started by a friend, Peter Brodsky. Dkt. No. 16-1, at T 535-36.

---

[2] The cited page numbers for the Answer (Dkt. No. 14), Respondent's Memorandum of Law (Dkt. No. 14-1), and the Transcripts (Dkt. Nos. 16-1 and 16-2) refer to those generated by the court's electronic filing system. Although Respondent did not sequentially number the State Court Records as required by Local Rule 72.4, the Court has reviewed these records for the sake of expediency. The cited page numbers for the State Court Records (Dkt. Nos. 15-1 through 15-6) refer to those generated by the Court's electronic filing system.

While working at Predictive, petitioner began dating Caroline Coffey. Although petitioner seemed happy with the relationship, he confided in Brodsky that he felt uneasy that they were moving in together and had started discussing marriage. Dkt. No. 16-1, at T 541-42.

During the spring and summer of 2008, petitioner's performance at Predictive began to deteriorate. Petitioner began drinking heavily, was missing work, and drastically reduced his office hours. Dkt. No. 6-1, at T 543-44, 547. The produce launch went poorly, and according to Brodsky, was the result of petitioner's inadequate work. While petitioner was on vacation, Brodksy and Predictive's CEO emailed petitioner about their concerns, and when he returned, they offered petitioner a leave of absence or his resignation. Petitioner felt he was treated unfairly, left the company, and never spoke to Brodsky again. *Id.* at 544-46, 549.

In October 2008, petitioner and Coffey married in a small civil ceremony in Ithaca, New York. They planned to hold a larger wedding in Costa Rica the following year. Dkt. No. 16-1, at T 520-21.

In January 2009, petitioner returned to his doctoral program at Cornell University. Dkt. No. 16-1, at T 710-11.

In May 2009, petitioner and Coffey held a wedding in Costa Rica. Dkt. No. 16-1, at T 521-22.

According to each witness that testified during the trial, no one was aware that petitioner was unhappy in his marriage, and none of the witnesses expressed observing any signs that petitioner suffered from a mental illness.

On June 2, 2009, Coffee went to work as usual around 9 a.m. Later that day, petitioner went to see Coffey to drop off wedding photographs which had arrived. Dkt. No.

3

16-1, at T 598-99, 602.  Petitioner also met with his faculty advisor, who informed him that additional funding was received for his work, and that he was happy to continue supporting petitioner's research for the foreseeable future.  *Id.* at T 720-22.

After work, petitioner went to a friend's house to lift weights.  They joked and laughed, and petitioner expressed that everything was going well, and that he and Coffey were planning to go away for a few days together.  Petitioner left to go home at 6:00 p.m.  Dkt. No. 16-1, at T 512-19.

As was their routine, petitioner and Coffey went for an evening jog.  On the trail, petitioner recalled letting Coffey take the lead while jogging.  When he ran past a pipe he had previously seen on the trail, he picked it up and sprinted to his wife.  He then struck her in the head with the pipe.  After Coffey fell to the ground, petitioner struck her again.  Petitioner proceeding to slash Coffey's neck with a box cutter he had brought with him.  Petitioner left Coffey on the trail and ran home.  Defense Exhibit D ("Ex. D"), Jul. 19, 2009.[3]

Once home, petitioner saw his clothes were covered in blood and attempted to burn them.  He doused his clothes with paint thinner and placed them in the fire place.  When he saw that his face and hands were covered with Coffey's blood, petitioner decided he was going to kill himself.  Ex. D, Jul. 19, 2009.

Petitioner left the box cutter he used to murder Coffey at home, and drove to a park. Once there, petitioner lost his nerve to jump off a bridge and returned home to get a sharper knife to kill himself.  Ex. D, Jul. 19, 2009.  At approximately 9:45 p.m., New York State Police

---

[3]  Respondent traditionally filed several videotaped interviews of petitioner which were introduced during his trial. Dkt. No. 21.  The cited portions of the videotaped interview by Dr. Horwitz are identified as the People's Exhibit 146 ("Ex. 146"), and the cited portions of the interviews with Dr. Houghtalen are identified as Defense Exhibit D ("Ex. D.") followed by the date of the interview.

Officer Gerald Lewis saw petitioner sitting in his car in the parking lot of the park. The officer shined his flashlight into the vehicle and saw that petitioner was covered with dried blood all over his left arm and hand. When he tapped on the window, petitioner did not make eye contact, but started his car and accelerated out of the parking lot. Dkt. No. 16-1, at T 83-91.

Officer Lewis called in petitioner's description and pursued petitioner as he drove over 90 miles per hour down a road. After other police vehicles joined in the pursuit, the roadway became congested, and petitioner was forced to slow down. All of a sudden, petitioner's vehicle drifted over the double yellow line and came to a stop near some trees. Dkt. No. 16-1, at T 91-95.

The police found petitioner in his car with several large lacerations on his neck. He was unconscious and holding a utility knife in his hand. Petitioner was only clothed in his bathrobe. The police and paramedics administered first aid, and when they found his identification in his glove compartment, petitioner began to gain consciousness. He corrected the police on how to pronounce his name, and asked where his wife was. Petitioner then became agitated and yelled that he wanted to die. Petitioner was airlifted to a medical facility in Pennsylvania. Dkt. No. 16-1, at T 98-103, 123-24, 144-46, 183-87.

The following morning, Coffey's body was found by two pedestrians on the trail where petitioner had killed her the night before. Dkt. No. 16-1, at T 111-13, 165-68.

A forensic pathologist who conducted an autopsy of Coffey's body concluded that she sustained a blow with a heavy linear object to her right eye area. Other bruises and scrapes to her right wrist and forearm, as well as her nose and right eyelid, suggested that Coffey tried to defend herself from the blow to her face. Although the blow was not fatal, the pathologist opined it rendered her unconscious. Coffey then sustained a stab wound to her

5

carotid artery. The pathologist estimated that Coffey died within two minutes of having her throat slit. Dkt. No. 16-1, at T 303-29.

The police also executed a search warrant on petitioner and Coffey's apartment. There they seized a pair of blood-stained sneakers, a fire-damaged computer, and a can of Kleen Strip Brush Cleaner which police suspected was used as a fire accelerant. Police also found remnants of clothes in the ashes of the fireplace. Police also took swabs from a wine refrigerator and a light switch which were covered in blood. Dkt. No. 16-1, at T 239-52, 255-64, 268-73, 334-40.

Upon investigation, the Ithaca Fire Department determined that the fire was deliberately set in two different locations in the apartment. Dkt. No. 16-1, at T 342-65.

Subsequent DNA testing revealed that the bloodstain on the sneakers was consistent with Coffey's DNA. The blood on the wine refrigerator was a mixture of both petitioner's and Coffey's DNA. The blood found on the knife petitioner was holding when he drove off the road contained blood from petitioner and another person: Coffey could not be excluded as the donor. Petitioner's DNA was found on the laptop and the Kleen Strip can, as well as the stains on the bridge. Dkt. No. 16-1, at T 464-78.

New York State Police investigators also analyzed data found on the computer taken from the apartment. Dkt. No. 16-1, at T 656-93. The analysis showed the computer was configured for petitioner's use and that sometime between 7:45 p.m. and 9.29 p.m. on the date of Coffey's murder, the following query was entered in Google: "how to kill neck." *Id.* at T 659-64. The first link was to a Yahoo page entitled "Is there an artery or vein in the neck that if cut can kill you instantly." *Id.* The user next searched Google for jugular vein, and clicked through the results page to the Wikipedia entry for "Jugular Vein." *Id.*

At the jury trial held in April 2010, defendant conceded that he killed his wife, but argued that he was acting under extreme emotional duress. Accordingly, the County Court instructed the jury to consider this affirmative defense. In support of this defense, petitioner presented videotaped interviews conducted between July 19, 2009 and April 4, 2010, by Dr. Rory Houghtalen, a forensic psychologist hired by petitioner's counsel. Dkt. No. 21, Ex. D.

During the trial, Dr. Houghtalen testified that he interviewed petitioner on four separate occasions. Dkt. No. 16-2, at T 71. Dr. Houghtalen stated that he found petitioner credible and concluded that he suffered from a "substance-induced depressive psychosis." *Id.* at T 203. Specifically, Dr. Houghtalen opined that petitioner's use of an anti-malarial drug chloroquine, which petitioner took prior to visiting Costa Rica, combined with petitioner's underlying major depressive disorder which included hallucinations, and a schizotypal personality disorder gave petitioner an "underlying vulnerability to psychosis." *Id.* at T 146, 159, 193-94, 203. Dr. Houghtalen ultimately opined that under New York State Law, petitioner's mental state at the time he killed his wife was "consistent with an extreme emotional disturbance." *Id.* at T 287-89.

At no point during Dr. Houghtalen's extensive evaluation of petitioner, or during his five days of testimony during the trial, did he question or raise any issue regarding petitioner's competency to stand trial.

To rebut Dr. Houghtalen's opinion, the People presented the testimony of forensic psychiatrist, Gary Horwitz. Dr. Horwitz testified to reviewing the prior interviews conducted by Dr. Houghtalen, reviewing medical reports and articles about chloroquine, and conducting his own interview with petitioner. Dkt. No. 16-2, at T 483, 490.

During Dr. Horwitz' interview with petitioner prior to trial, he asked if petitioner understood the purpose of their meeting. Petitioner responded that he knew Dr. Horwitz was working for the prosecution. Petitioner also said that he understood he was pursuing an extreme emotional disturbance defense, so he needed a psychiatrist to determine what his state of mind was. Dkt. No. 21, Ex. D. After a lengthy interview, Dr. Horwitz told petitioner his description of his "mental illness" did not comport with someone who is mentally ill, but instead as someone pretending to be mentally ill to "outsmart the system." *Id.* Dr. Horwitz also asked if petitioner knew what the outcome would be if he prevailed on his extreme emotional disturbance defense at trial. Petitioner responded that he would only get "a manslaughter conviction." *Id.*

At trial, Dr. Horwitz rejected the defense's position that petitioner was under extreme emotional disturbance when he killed his wife. Instead, he opined that petitioner killed his wife because he was unhappy and stressed, and "saw Caroline as the obstacle to the life he wanted." Dkt. No. 16-2, at T 499-500, 510. He specifically noted that the killing was pre-meditated, and that petitioner used extensive forethought and planning before committing the murder. *Id.* at T 500, 516-17. He also noted that petitioner attempted to conceal his crime and destroy evidence. *Id.* at T 500.

Notably, Dr. Horwitz credited petitioner's interview with Dr. Houghtalen that occurred closest to the date of the crime. Dkt. No. 16-2, at T 519-22. During that initial interview, Dr. Horwitz observed that petitioner had a normal affect, and said nothing about conspiracies, or hallucinations. *Id.* Dr. Horwitz also noted that none of his close family, friends, or associates, noticed anything wrong or unusual with petitioner's behavior, countering

petitioner's claim of suffering an ongoing mental illness. *Id.* at T 522-23. Finally, Dr. Horwitz rejected Dr. Houghtalen's theory that petitioner's use of an antimalarial drug caused a psychological disturbance. According to the reports reviewed by Dr. Horwitz and relied upon by Dr. Houghtalen, petitioner's supposed illness did not match the onset pattern noted in the reports, and that those who developed a psychological disturbance all took much larger doses of the drug than petitioner. *Id.* at T 523-31. In sum, Dr. Horwitz opined that petitioner did not suffer from a psychiatric disorder, but "was stressed and unhappy. He saw Caroline as an obstacle to the life he wanted, and he decided that he had to kill her." *Id.* at 531.

On April 20, 2010, a jury found petitioner guilty of all charges: Murder in the Second Degree (N.Y. Penal Law § 125.25(1)), Arson in the Third Degree (N.Y. Penal Law § 150.10(1)), and Tampering with Physical Evidence (N.Y. Penal Law § 215.40(2)). Dkt. No. 16-2, at T 849-50. On June 16, 2010, petitioner was sentenced to an aggregate term of twenty-five (25) years to life in prison. *Id.* at T 895.

### B.    Post-Trial Motion and Appeal

In addition to filing a direct appeal to the Appellate Division, Third Department (Dkt. No. 15-6, at SR 154-261), petitioner moved, through counsel, to vacate his judgment of conviction pursuant to New York's Criminal Procedure Law ("C.P.L.") § 440.10. Dkt. No. 15-1 through 15-5. Among other things, petitioner sought relief on the ground that his counsel was ineffective for (1) failing to move for a competency evaluation; and (2) failing to object to Officer Kubasiak's testimony regarding the internet searches on petitioner's laptop and to Dr. Horwitz's testimony to the extent it differed from his written report. Dkt. No. 15-1, at SR 1-2. Petitioner attached his own affidavit and affidavits from his trial counsel and Dr. Houghtalen,

as well as his most recent medical records. *Id.* at SR 6-38. The trial court denied the motion, holding that all of petitioner's claims were on the record and needed to be raised on direct appeal. Dkt. No. 15-6, at SR 133-135.

Petitioner sought leave to appeal the denial of his C.P.L. § 440.10 motion. The Appellate Division granted the appeal of his C.P.L. § 440 motion, and joined it with his pending direct appeal. *Id.* at 153. The Appellate Division ultimately affirmed petitioner's conviction finding, among other things, that petitioner was not deprived the effective assistance of counsel. *People v. Kot*, 126 A.D.3d 1022, 1025 (3rd Dep't 2015). Petitioner then sought leave to appeal to the New York State Court of Appeals, which was denied on July 13, 2015. *People v. Kot*, 25 N.Y.3d 1203 (2015).

## III.  DISCUSSION

### A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §§2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'" *Nevada v. Jackson*, __ U.S. __, 133 S. Ct. 1990, 1992 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, __ U.S. __, 133 S. Ct. 1781, 1787 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Richter*, 562 U.S. at 103)).

Additionally, the AEDPA foreclosed "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, __ U.S. __, 132 S. Ct. 2148, 2149 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779). A state court's findings are not unreasonable under §2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro*, 550 U.S. at 473.

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with '"clear and convincing evidence.'" *Schriro*, 550 U.S. at 473-74 (quoting § 2254(e)(1)). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, __ U.S. __, 133 S. Ct. 1088, 1096 (2013).

**B.      Ineffective Assistance of Counsel**

Petitioner argues his trial counsel was ineffective because he failed to (1) move for a competency hearing; and (2) failed to object to (a) Officer Kubasiak's testimony concerning the timing of the internet searches on petitioner's laptop computer, and (b) Dr. Horwitz's testimony to the extent it differed from his written report.  Pet. at 5.

**1.      Standard of Review**

To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show "both deficient performance by counsel and prejudice."  *Premo v. Moore*, 562 U.S. 115, 121-122 (2011) (*quoting Knowles v. Mirzayance*, 556 U.S. 111, 122, 129); *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  Deficient performance requires a showing that counsel's performance fell below an objective standard of professional reasonableness. *Id.*; *Harrington v. Richter,* 562 U.S. 86, 104 (2010).  "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney."  *Richter*, 562 U.S. at 110 (quoting *Strickland*, 466 U.S. at 687) (internal quotation marks and further citation omitted).  A petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Even assuming a petitioner can establish counsel was deficient, he still must demonstrate prejudice.  *Id.* at 693-694.  This requires more than showing "the errors had some conceivable effect on the outcome," but that the counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.* at 687, 693.

Meeting this burden is "never an easy task . . . [and] establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Premo*, 131 S. Ct. at 739-40 (citations and internal quotation marks omitted). When reviewing a state court's decision under section 2254, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks and citation omitted). Federal habeas courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" because "[w]hen §2254(d) applies, the question is not whether counsel's actions were reasonable." *Richter*, 562 U.S. at 105. Instead, "the question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Finally, it is "difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Richter*, 562 U.S. at 111.

## 2. Ground One - Failure to request competency hearing

The Supreme Court has repeatedly held that "'the criminal trial of an incompetent defendant violates due process.'" *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996)**,** *quoting Medina v. California*, 505 U.S. 437, 453 (1992); *see also Woodley v. Griffin*, 652 Fed. Appx. 75, 76 (2d Cir. 2016). As the Supreme Court explained in *Cooper*, a "defendant may not be put to trial unless he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and a rational as well as factual understanding of the proceedings against him." *Id.* (internal citations and quotations omitted); *see also Harris v. Kuhlmann*, 364 F.3d 330, 349-350 (2d Cir. 2003).

Under New York Law, a defendant is presumed to be competent. *People v. Tortorici*, 92 N.Y.2d 757, 765 (1999). A New York Court must only "issue an order of examination when it is of the opinion that the defendant may be an incapacitated person." N.Y. C.P.L. § 730.30. An "incapacitated person" is defined as a "defendant who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense." *Id.*

Here, petitioner maintains that he was deprived the effective assistance of counsel due to his counsel's failure to request a competency hearing prior to trial. Pet. at 5-6. In addition to raising this argument on appeal, petitioner also argued that the trial court denied him procedural due process by failing to *sua sponte* order a competency examination. Dkt. No. 15-1, at SR 64-72, 108-111; Dkt. No. 15-6 at 209-215, 255-257.

The Appellate Division rejected petitioner's claim that the County Court denied him due process for failing to *sua sponte* order a competency hearing. *Kot*, 126 A.D.3d at 1024. The Appellate Division first noted that County Court was able to observe petitioner's "behavior and demeanor in the courtroom throughout the trial, as well as in video excerpts from his discussions with [Dr.] Houghtalen." *Id.* "During the trial, Houghtalen did not opine that [petitioner] was incompetent, and defense counsel at no point requested a competency hearing." *Id.* The Appellate Division went on to state as follows:

> Up to and throughout the trial, defendant continuously exhibited an awareness of the nuances of the criminal justice process, including . . . the crucial role that Houghtalen, as his forensic psychiatric expert, would play in his defense. Defendant's forthright disclosures to Houghtalen concerning the dysfunction he observed in his family during his youth, and the mental health symptoms he reportedly experienced in the days and months leading up to his crime, support the conclusion that any psychiatric conditions from which he might have been suffering over the course of the instant criminal action did not prevent him from recognizing that providing Houghtalen with details of his mental health history would bolster his defense, nor from actually supplying such information to Houghtalen."

*Id.* at 1025.  Accordingly, "[based] on the available information" the Appellate Division held that County Court did not abuse its discretion in not, *sua sponte*, ordering a competency hearing.  For the same reasons, the Appellate Division also found "without merit defendant's contention that he was deprived of the effective assistance of counsel due to counsel's failure to request a competency hearing or to present an insanity defense."  *Id.*

Here, in order to establish that his counsel was ineffective in failing to request a competency hearing, "the record must show some evidence indicating that Petitioner's competency was in doubt."  *Thousand v. Conway*, No. 6:08-CV-6469T, 2010 WL 4823664 (W.D.N.Y. Nov. 29, 2010).  Since the Appellate Division rendered a decision on the merits, "the relevant question in this case is not whether the evidence 'presented a reasonable ground for believing' that [petitioner] was incompetent; instead we must ask whether it was *objectively unreasonable* for the state trial court to have concluded (and the state appeals court to have agreed) that the circumstances *did not* present a reasonable ground for believing that [petitioner] was incompetent."  *Kuhlmann*, 346 F.3d at 356 (italics in original) (internal quotations omitted).

Similarly, with regards to counsel's actions, the relevant question is not whether this Court believes petitioner's counsel acted unreasonably by not requesting a competency hearing, but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Richter*, 562, U.S. at 105; *see also* 28 U.S.C. §2254(d)(1).

The record before this Court does not substantiate petitioner's claim that his counsel was ineffective for failing to request a competency hearing.  To the contrary, the record demonstrates that petitioner acted rational at all relevant times, and participated in his defense.

For instance, petitioner was also able to clearly articulate during his hours of video-taped interviews with Dr. Houghtalen that he understood that (1) his counsel had retained Dr. Houghtalen to determine whether he qualified for a psychiatric defense, (2) there was no confidentiality between them, and (3) Dr. Houghtalen was not treating petitioner.  *See* Dkt. No. 21, Ex. D.  Notably, at no time prior to or during trial did Dr. Houghtalen suggest that petitioner was incompetent to stand trial, or indicate that petitioner was not cooperating in presenting a defense.

Furthermore, when petitioner met with the People's psychiatric expert, Dr. Horwitz, petitioner was able to explain his legal situation in great detail.  He identified the charges against him, and explained to Dr. Horwitz that if he prevailed on his extreme emotion disturbance defense, that he would only face a manslaughter conviction.

Petitioner nevertheless requests this Court to consider post-conviction psychiatric reports and affidavits submitted by his trial counsel and Dr. Houghtalen in his C.P.L. § 440 motion in state court.  However, "the question of competency and reasonable cause to doubt it must focus upon the defendant's abilities *at the time of trial*, not any conduct discovered or analyzed after the fact."  *United States v. Gabb*, 80 Fed. Appx. 142, 144-145 (2d Cir. 2003) (italics in original), *quoting United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986); *see e.g., Conway,* 2010 WL 4823664, at *6-7 (The district court concluded that a post-conviction letter from petitioner's counsel did not establish that counsel had any basis to doubt the petitioner's competency during the plea and sentencing); *Medina v. McGinnis*, No. 04-CV-2515, 2004 WL 2088578 (S.D.N.Y. Sept. 20, 2004) (The petitioner's ineffective assistance claim based on post-conviction medical records and his physician's affidavit was rejected "because defense counsel did not have that information, and this Court agrees . . .that based

on defense counsel's knowledge, he was not ineffective for not investigating [petitioner's] psychological problems more than he did.").

Petitioner's post-conviction medical records and subsequent psychiatric treatment do not show that petitioner's counsel should have known or investigated petitioner's alleged competency further prior to trial. Furthermore, these post-conviction documents do not demonstrate that petitioner's counsel was aware before or during the trial that petitioner was unable to understand the proceedings against him. In fact, petitioner's counsel states in his affidavit that he did not request a competency hearing during petitioner's case because "[petitioner] displayed knowledge of the role of the defense attorney, prosecutor, and judge, and the function of the jury. It had been my experience that a person who was capable of functioning to that degree would not be declared incompetent." Dkt. No. 15-1, at SR 31. Although petitioner's counsel now has "misgivings" about not requesting a competency hearing, he explicitly states such apprehension is based on "knowing what I know now about" petitioner's psychiatric illness. *Id.* at SR 32. As such, the post-conviction records are not relevant to petitioner's ineffective assistance claim.

Based on counsel's knowledge at the time of trial, and giving due deference to the Appellate Division's factual findings on this issue (*Schriro*, 550 U.S. at 473-74), counsel's decision not to request a competency hearing was reasonable, and petitioner has not established that his counsel's actions fell below the objective standard of effectiveness set forth in *Strickland*. The Appellate Division's decision that petitioner's counsel provided effective assistance was therefore not objectively unreasonable, and petitioner's ineffectiveness claim based on his counsel's failure to request a competency hearing is denied.

### 3. Ground Two: Failure to Raise Objections

Petitioner argues in Ground Two of his habeas petition that his counsel was ineffective for (1) failing to object to Investigator Kubasiak's testimony regarding the timing of internet searches on petitioner's laptop computer, and (2) failing to object to Dr. Horwitz's testimony to the extent it conflicted with his written report provided prior to trial.  Pet. at 5.

During the trial, Investigator Kubasiak testified that petitioner's laptop was used to run the following query in Google: "how to kill neck," along with other searches regarding the jugular vein.  According to Investigator Kubasiak, the queries were performed sometime between the following time-frames: 7:54 p.m. to 8:46 p.m., or 9:27:18 p.m to 9:28:04 p.m. Dkt. No. 16-1, at T 656-69, 683-86,692-93.  Petitioner argues his counsel should have objected when Investigator Kubasiak testified, in response to the trial court's questioning, that although it was "possible" that the queries regarding the neck anatomy occurred during the 46 second session after the victim was killed, it "likely wouldn't happen in this time frame because of the extent of the searches that were occurring."  *Id.* at 668-69.

Although a lay witness is ordinarily limited to testifying about facts as opposed to opinion, petitioner was not prejudiced by Investigator Kubasiak's testimony; i.e., the error in allowing the testimony without objection did not effect on the outcome and deprive petitioner a fair trial.  *Strickland*, 466 U.S. at 687, 693-94.  To be sure, despite Investigator Kubasiak's comment suggesting the internet search occurred during the earlier session when petitioner's computer was active, he repeatedly testified that he could not definitively state when the internet searches were performed.  Dkt. No. 16-1, at T 679-680, 692-93.  Furthermore, during summation, the prosecutor acknowledged that the time of the internet search "is one of those things I can't prove to the exact time it was done.  You heard for yourselves that time

18

frame, somewhere between 8:27 and 9:27. I can't prove to you that it happened earlier on." Dkt. No. 16-2, at T 759. Accordingly, failing to object to Investigator Kubasiak's statement was not "so serious as to deprive [petitioner] of a fair trial," and this portion of petitioner's ineffective assistance claim is denied and dismissed. *Strickland*, 46 U.S. at 687, 693.

Petitioner also argues that his counsel was ineffective for failing to object to Dr. Horwitz's testimony to the extent it was in conflict with his written report. Pet. at 5. According to petitioner, the written report primarily concluded that petitioner was feigning his mental illness. However, at trial, petitioner claims Dr. Horwitz testified for the first time that his psychiatric symptoms were primarily the result of suggestive questioning by Dr. Houghtalen. *Id.* The Appellate Division rejected this claim on the merits. *Kot*, 126 A.D.3d at 1027 ("Defendant's remaining arguments . . . have been considered and are without merit."). For the reasons that follow, the Appellate Division's decision was neither contrary to, nor an unreasonable application of *Strickland.*

As respondent correctly notes in opposition, Dr. Horwitz did opine in his written report that petitioner's alleged psychiatric symptoms were the result of suggestive questions posed by Dr. Houghtalen, among other things. For instance, Dr. Horwitz described Dr. Houghtalen's first meeting with petitioner on July 19, 2009. During that interview, Dr. Houghtalen asked whether petitioner ever heard voices, and petition responded negatively, reporting only an "internal dialogue of his own thoughts." Dkt. No. 15-4, at SR 193. According to Dr. Horwitz, "[t]his [was] significant because the nature of the questions raised by Dr. Houghtalen would indicate to a person as intelligent as defendant that he was looking for a psychotic disorder." *Id.* Dr. Horwitz goes on to note that petitioner's description of his alleged psychotic symptoms did not emerge until after this initial meeting, and that his descriptions were often inconsistent. *Id.* at 193-95.

Dr. Horwitz ultimately opined in his report that petitioner was not suffering a serious mental disorder, nor was he delusional when he killed his wife. Instead, Dr. Horwitz maintained he was "stressed and unhappy about his situation and increasingly saw his wife as the obstacle between himself and the life he wanted." *Id.* at 195. Given petitioner's premeditation and high degree of forethought and planning of the murder, and the desire that someone else might be blamed for the killing, Dr. Horwitz rejected petitioner's claim that he simply lost control and was in extreme emotional distress at the time of the murder. *Id.* at 197.

During the trial, Dr. Horwitz did not deviate from this opinion. He opined hat petitioner was not suffering an extreme emotional disturbance at the time of the murder because (1) the killing was premeditated; (2) there was extensive forethought and planning involved which did not indicate a "loss of emotional control, but was something that was developed;" (3) the psychiatric evaluation performed shortly after petitioner was transferred to Ithaca "found no hallucinations or other psychotic features," and (4) during petitioner's first meeting with Dr. Houghtalen, which Dr. Horwitz opined was more reliable as it was closest to the killing, petitioner denied having any delusions or hallucinations. Dkt. No. 16-2, at T 516-531.

Dr. Horwitz only made two comments during the trial indicating that petitioner's description of his symptoms was the result of suggestive questioning over time by Dr. Houghtalen. Dkt. No. 16-2, at T 506-507, 651-53. These statements did not contradict what was already contained in his report in any meaningful way. Accordingly, even if counsel objected to Dr. Horwitz's testimony on the ground it was inconsistent with his report, the objection would have been denied. Petitioner is therefore not entitled to habeas corpus relief and his ineffective assistance claim is denied and dismissed.

20

## IV. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the petition, Dkt. No. 1, is **DENIED AND DISMISSED**; and it is further

**ORDERED** that no Certificate of Appealability ("COA") shall issue because petitioner failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires.[4] Any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED** that the Clerk serve copies of this Decision and Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated:    January 23, 2017
          Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge

---

[4] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *See Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that, if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, and (2) that the applicant has established a valid constitutional violation" (citation omitted)).